## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES MURRAY, on Behalf of Himself and of All Others Similarly Situated, | **Civ. No. 23-cv-5102** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| ENZO BIOCHEM, INC., ENZO CLINICAL LABS, INC., and LAB CORPORATION OF AMERICA HOLDINGS, | |
| Defendants. | |

Plaintiff James Murray ("Plaintiff"), individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Enzo Biochem, Inc. ("Enzo Biochem"), Enzo Clinical Labs, Inc. ("Enzo Clinical"), and Lab Corporation of America Holdings ("LabCorp" and collectively with Enzo Biochem and Enzo Clinical, "Defendants") and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and good faith belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     Plaintiff brings this class action against Defendants for their failure to properly secure and to safeguard personally identifiable information ("PII") including Plaintiff's and Class Members' names, Social Security numbers, and/or medical records (collectively, "Private Information" or "PII"). Defendants' severe failures have affected—and continue to affect—over 2.4 million people.

2.      On or about April 6, 2023, Defendants "identified a ransomware incident on [their] computer network." A subsequent investigation determined that there was a cybersecurity incident between April 4, 2023, and April 6, 2023 during which unauthorized third parties accessed Plaintiff's and Class Members' Private Information stored on Defendants' network (the "Data Breach").

3.      Defendants launched an investigation into the Data Breach and confirmed that an unauthorized actor accessed their system and certain files containing Plaintiff's and Class Members' Private Information, including names, dates of service, and clinical test information.

4.      While Defendants claim that social security numbers were not among the impacted data sets, Defendants admitted in a filing with the Securities and Exchange Commission that approximately 600,000 Class Members' Social Security numbers were accessed.[1]

5.      The Notice of Data Incident sent to Plaintiff states the following:

**What Happened?** On April 6, 2023, [Enzo Biochem] identified a ransomware incident on our computer network. We immediately took steps to secure our systems and began an investigation with the assistance of a cybersecurity firm. We also notified law enforcement. The investigation determined that an unauthorized party accessed files on our systems between April 4, 2023, and April 6, 2023.

6.      Based on the Notice of Data Breach, Defendants admit that Plaintiff's and Class Members' Private Information was unlawfully accessed by a third party.

7.      Upon information and good faith belief, Defendants were on notice of the high potentiality for this exact sort of data security incident and yet maintained the Private Information in a negligent manner. In particular, Private Information was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. Upon information and belief, the

---

[1] https://www.sec.gov/Archives/edgar/data/316253/000121390023044007/ea178836-8k_enzobiohem.htm (last visited July 5, 2023, 2023).

mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants and, thus, Defendants were on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information could be compromised and stolen.

8.      As a result, Plaintiff's and Class Members' Private Information has been compromised and they now face an ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers – the gold standard for identity thieves. The exposed Private Information of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.

9.      In addition to the ongoing risk of identity theft, those impacted by the Data Breach have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; (i) anxiety, annoyance, and nuisance, and (j) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

10.     While many details of the Data Breach remain in the exclusive control of Defendants, upon information and belief, Defendants breached their duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and

maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that their network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

11.     Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief including improvements to Defendants' data security systems, and future annual audits.

12.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed. Accordingly, Plaintiff brings this action against Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of confidentiality, (iii) breach of fiduciary duty; (iv) unjust enrichment; (v) bailment; (vi) violations of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. Law

§ 349 *et seq*.; (vii) violations of the Connecticut Unfair Trade Practices Law, Conn. Gen. Stat. §§ 42-110a *et seq*.; (viii) breach of implied contract; and (ix) declaratory judgment.

## PARTIES

13.     Plaintiff, James Murray, is a citizen of the State of Connecticut residing in Fairfield County, Connecticut.

14.     Plaintiff received a letter dated May31, 2023 from Defendants notifying him that their network had been accessed and that her Private Information may have been involved in the Data Breach.

15.     Defendant Enzo Biochem, Inc. is a for-profit corporation organized under the laws of the State of New York, with its principal place of business located at 81 Executive Blvd., Suite 3, Farmingdale, NY 11735.

16.     Defendant Enzo Clinical Labs, Inc. is a for-profit corporation organized under the laws of the State of New York, with its principal place of business at 28 Liberty Street, New York, NY 10005.

17.     Defendant Lab Corporation of America Holdings is a North Carolina Corporation, with its principal place of business at 531 South Spring Street, Burlington, NC 27215.

## JURISDICTION & VENUE

18.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5 million, exclusive of interest and costs. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19.     This Court has personal jurisdiction over Enzo Biochem because it maintains its principal place of business in this District and does substantial business in this District.

20.     This Court has personal jurisdiction over Enzo Clinical because it maintains its principal place of business in  New York City and does substantial business in this District.

21.     This Court has personal jurisdiction over Defendant LabCorp because it does substantial business in this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

*The Data Breach*

23.     On or about April 6, 2023, Defendants became aware that their network may have been breached.

24.     Following a forensic investigation, Defendants then discovered that cybercriminals had—between April 4, 2023, and April 6, 2023—accessed a set of electronically stored personal information stored on their network.

25.     Defendants' Notice of Data Breach admits that Plaintiff's and Class Members' Private Information was accessed without authorization.[2]

*Plaintiff James Murray's Experience*

26.     As a requisite to receiving medical services from Defendants, Plaintiff provided his Private Information to Defendants and trusted that the information would be safeguarded according to state and federal law. Upon receipt, Private Information was entered and stored in Defendants' network and systems.

---

[2] *See* May 31, 2023, Data Breach Letter from Enzo Clinical Labs (attached as **Exhibit 1**).

27.    Plaintiff is very careful about sharing his sensitive Private Information, and he has never knowingly transmitted unencrypted sensitive Private Information.

28.    Plaintiff stores any documents containing his sensitive Private Information in a safe, secure location or destroys the documents using a shredder. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts using a unique password generator and password vault application. Had he known Defendants failed to follow basic industry security standards and failed to implement systems to protect his Private Information, he would not have provided that information to Defendants.

29.    The Notice Letter dated May 31, 2023 from Defendants notified Plaintiff that their network had been accessed and Plaintiff's Private Information may have been involved in the Data Breach, which included Plaintiff's name, dates of service, and clinical test information.

30.    Furthermore, Defendants directed Plaintiff to be vigilant and to take certain steps to protect his Private Information and otherwise mitigate his damages.

31.    As a result of the Data Breach, Plaintiff heeded Defendants' warning and spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendants' direction by way of the Data Breach notice where Defendants advised Plaintiff to mitigate his damages by, among other things, reviewing his healthcare statements for accuracy.

32.    Even with the best response, the harm caused to Plaintiff cannot be undone.

33.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach.

34.    Plaintiff also lost his benefit of the bargain by paying for medical services that failed to provide the data security that was promised.

35.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

36.    Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

37.    Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

38.    Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***The Data Breach Was Eminently Foreseeable***

39.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

40.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to potentially millions of

individuals' detailed, personal information and thus the significant number of individuals who would be harmed by the exposure of the unencrypted data.

41.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

42.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

43.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[4] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

44.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

45.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller

---

[3] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed July 5, 2023, 2023).
[4] *See* 2021 Data Breach Annual Report, 6 (ITRC, Jan. 2022) available at https://notified.idtheftcenter.org/s/ (last accessed July 5, 2023, 2023).

municipalities and hospitals are attractive to ransomware criminals … because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[5]

46.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks between 2019 and 2020.[6]

47.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

***Value of PII & PHI***

48.     The PII of consumers remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[7] of According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an

---

[5] FBI, Secret Service Warn of Targeted Ransomware, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware

[6] *See* Maria Hernandez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited July 5, 2023, 2023).

[7] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed July 5, 2023).

average market value $120.[8] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[9]

49.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

50.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[10]

51.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

52.     The fraudulent activity resulting from the Data Breach may not come to light for years.

53.     Theft of PHI (personal health information) is also gravely serious: "[a] thief may use your identity to see a doctor. He or she may get prescription drugs or to (sic) file claims with your insurance company in your name. If the thief's medical treatment or diagnosis mixes with your treatment or diagnosis, your health is at risk."[11]

---

[8]    *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, available at: https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed July 5, 2023).

[9]    *In the Dark,* VPNOverview, 2019, available at https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed July 5, 2023).

[10]    Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

[11]    *First Aid for Medical Identity Theft: Tips for Consumers*, State of California Department of Justice, available at: https://oag.ca.gov/privacy/facts/medical-privacy/med-id-theft (last accessed Jul7 5, 2023).

54.     There is also a robust legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data.

55.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

56.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[12]

57.     As such, future monitoring of financial and personal records is reasonable and necessary but no assistance in this vein was offered to Plaintiff by Defendants.

***Defendants Failed to Properly Protect Plaintiff's and Class Members' Private Information***

58.     Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiff and Class Members. Alternatively, Defendants could have destroyed the data, especially for individuals with whom they had not had a relationship for a period of time.

---

[12] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at*: https://www.gao.gov/assets/gao-07-737.pdf (last accessed July 5, 2023).

59.    Defendants' negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants to protect and secure sensitive data they possess.

60.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

61.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

62.    The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

63.    To prevent and detect unauthorized cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

      • Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

---

[13] *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, Fed. Trade Comm., https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last accessed July 5, 2023).

• Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

• Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

• Configure firewalls to block access to known malicious IP addresses.

• Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

• Set anti-virus and anti-malware programs to conduct regular scans automatically.

• Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

• Configure access controls—including file, directory, and network share permissions—with least privilege in mind. For example, if a user only needs to read specific files, the user should not have "write" access to those files, directories, or shares.

• Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

• Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders

supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

• Consider disabling Remote Desktop protocol (RDP) if it is not being used.

• Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

• Execute operating system environments or specific programs in a virtualized environment.

• Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[14]

64. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

• **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

• **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (*e.g.*, contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (*e.g.*, .com instead of .net).

---

[14] *Id*. at 3-4.

• **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

• **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it.

• **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

• **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

• **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[15]

65.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

---

[15] *See* Cybersecurity & Infrastructure Security Agency, *Protecting Against Ransomware* (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last accessed July 5, 2023)

- Apply latest security updates

- Use threat and vulnerability management

- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

- Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely;

**Build credential hygiene**

- Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local administrator passwords.

**Apply principle of least-privilege**

- Monitor for adversarial activities.

- Hunt for brute force attempts.

- Monitor for cleanup of Event Logs.

- Analyze logon events.

**Harden infrastructure**

- Use Windows Defender Firewall.

- Enable tamper protection.

- Enable cloud-delivered protection.

- Turn on attack surface reduction rules and Antimalware Scan Interface for Office and Visual Basic for Applications.[16]

---

[16] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed July 5, 2023).

66.     Moreover, given that Defendants were storing the PII and PHI of Plaintiff and Class Members, Defendants could and should have implemented all the above measures to prevent and detect cyberattacks.

67.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

68.     As a result of computer systems in need of security upgrades and inadequate procedures for handling email phishing attacks, viruses, malignant computer code, and hacking attacks, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

69.     Because Defendants failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Defendants' network, and access Defendants' database and system configuration files and exfiltrate that data.

***Defendants Failed to Comply with FTC Guidelines***

70.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

71.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks;

understand their network's vulnerabilities; and implement policies to correct any security problems.[17]

72.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

73.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

75.    Defendants failed to properly implement basic data security practices.

76.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[17] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed July 5, 2023).

77.    Defendants were always fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

***Defendants Failed to Comply with Industry Standards***

78.    As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

79.    Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Defendants, including, but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

80.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

81.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

82.     The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

83.     Upon information and belief, Defendants failed to comply with one or more of the foregoing industry standards.

***Defendants' Negligent Acts & Breaches***

84.     Defendants participated and controlled the process of gathering the Private Information from Plaintiff and Class Members.

85.     Defendants therefore assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the duty of oversight, training, instruction, and testing of the data security policies and network systems. Defendants breached these obligations to Plaintiff and Class Members and/or were otherwise negligent because they failed to properly implement data security systems and policies for their health providers network that would adequately safeguarded Plaintiff's and Class Members' Sensitive Information.

86.     Upon information and belief, Defendants' unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

a) Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members Sensitive Information;

b) Failing to properly monitor their data security systems for data security vulnerabilities and risk;

c) Failing to test and assess the adequacy of their data security system;

d) Failing to develop adequate training programs related to the proper handling of emails and email security practices;

e) Failing to put into, develop, and place uniform procedures and data security protections for their healthcare network;

f) Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

g) Failing to ensure or otherwise require that they were compliant with FTC guidelines for cybersecurity;

h) Failing to ensure or otherwise require that they were adhering to one or more of the industry standards for cybersecurity discussed above;

i) Failing to implement or update antivirus and malware protection software in need of security updating;

j) Failing to require encryption or adequate encryption on their data systems;

k) Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' Private Information provided to Defendants, which in turn allowed cyberthieves to access their IT systems.

***Injuries & Damages***

87.    As result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

88.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual

injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

***The Risk of Identity Theft to Plaintiff & Class Members Is Present and Ongoing***

89.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

90.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

91.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

92.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[18]   Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[19]   This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

93.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII at issue here.[20] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of

---

[18]  *What Is the Dark Web?,* Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last accessed Jun. 26, 2023).

[19] *Id.*

[20]  *What is the Dark Web*? – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last accessed Jun. 26, 2023).

birth, and medical information.[21] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[22]

94.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[23]

> What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

95.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

---

[21] *Id.*

[22] *Id*

[23] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 5, 2023).

[24] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed July 5, 2023).

96.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[25]

97.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[26]

98.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[27]  Defendants did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

99.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

100.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the

---

[25] *Identity Theft and Your Social Security Number,* Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 5, 2023).

[26] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last accessed July 5, 2023).

[27] *Id.*

damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

101.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

102.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[28]

103.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.

104.    According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security

---

[28] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last accessed July 5, 2023).

features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[29]

105.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history, and reputation, and can take time, money, and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[30]

106.    Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

107.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

---

[29]    *See    generally*    https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed July 5, 2023).

[30]    *See, e.g.*,    https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last accessed July 5, 2023).

108.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendants' Notice instructs them, "review statements you receive from your healthcare providers for accuracy."

109.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity—which may take years to discover and detect—and filing police reports.

110.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office, who released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[31]

111.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

---

[31] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Ju,ly 5, 2023).

[32] *See* Federal Trade Commission, IdentityTheft.com, https://www.identitytheft.gov/Steps (last accessed July 5, 2023).

112.     A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information.[33]

113.     In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[34] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (considering an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[35]

***Diminution of Value of the Private Information***

114.     PII is a valuable property right.[36] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[33] "Credit card fraud and ID theft statistics" by Jason Steele, 6/11/2021, at: https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ (last accessed July 5, 2023).

[34] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed July 5, 2023). ("GAO Report").

[35] See https://www.identitytheft.gov/Steps (last accessed July 5, 2023).

[36] *See*, *e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

115.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

116.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[37]

117.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was selling on the dark web for $50 and up.[38]

118.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[39] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[40] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[41]

---

[37] *See* Ashiq JA, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), available at https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed July 5, 2023).

[38] *See* Lisa Vaas, *Ransomwear attacks paralyze, and sometimes crush, hospitals*, available at https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed July 5, 2023).

[39] *See* David Lazarus, Column: Shadowy data brokers make the most of their invisibility cloak, Los Angeles Times https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed July 5, 2023).

[40] *See* https://datacoup.com/ (last accessed July 5, 2023).

[41] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed July 5, 2023).

119.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

120.    To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach – Defendants have only offered two years of inadequate identity monitoring services through Kroll—and only to some Class Members, not to Plaintiff or many others—despite Plaintiff and all Class Members being at risk of identity theft and fraud for the foreseeable future. Defendants have also offered "$1 Million Identity Fraud Loss Reimbursement" to some Class Members, but not to Plaintiff or many others.

121.    The two years of credit monitoring and purported "$1 Million" reimbursement offered to some persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Defendants also place the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

122.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

123.    It must be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[42]

124.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

125.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[43] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

126.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

---

[42] *See* GAO Report, at p. 29.

[43] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web*, New Report Finds, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last accessed July 5, 2023).

127.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

***Injunctive Relief Is Necessary to Protect Against Future Data Breaches***

128.     Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

## CLASS ACTION ALLEGATIONS

129.     Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

130.     Specifically, Plaintiff proposes the following Nationwide Class, as well as a Connecticut Subclass (collectively, the "Class").

**Nationwide Class:**

All persons whose Private Information was actually or potentially accessed or acquired during the Data Breach for which Defendants Enzo Biochem, Inc., Enzo Clinical Labs, Inc., and Lab Corporation of America Holdings provided notice to Plaintiff and other Class Members beginning on or around May 31, 2023.

**Connecticut Subclass:**

All persons residing in Connecticut whose Private Information was actually or potentially accessed or acquired during the Data Breach for which Defendants Enzo Biochem, Inc., Enzo Clinical Labs, Inc., and Lab Corporation of America Holdings

provided notice to Plaintiff and other Class Members beginning on or around May 31, 2023.

131.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

132.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

133.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are nearly 2.5 million individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendants' records.[44]

134.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a) Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b) Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

---

[44]    Breach Portal, U.S. Dept of Health and Hum. Servs., https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited July 5,2023).

c) Whether Defendants had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d) Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e) Whether and when Defendants actually learned of the Data Breach;

f) Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g) Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i) Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k) Whether Defendants violated the consumer protection statutes invoked herein;

l) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

m) Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

n) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

135.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

136.   <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

137.   <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

138.   <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

139.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

140.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

141.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

142.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse

to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

143.    Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

144.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendants on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. Whether Defendants breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members; and

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (*On Behalf of Plaintiff & All Class Members*)

145.   Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

146.   Upon gaining access to the PII of Plaintiff and members of the Class, Defendants owed to Plaintiff and the Class a duty of reasonable care in handling and using this information and securing and protecting the information from being stolen, accessed, and misused by unauthorized parties. Pursuant to this duty, Defendants were required to design, maintain, and test their security systems to ensure that these systems were reasonably secure and capable of protecting the PII of Plaintiff and the Class. Defendants further owed to Plaintiff and the Class a duty to implement systems and procedures that would detect a breach of their security systems in a timely manner and to timely act upon security alerts from such systems.

147.   Defendants owed this duty to Plaintiff and the other Class members because Plaintiff and the other Class members compose a well-defined, foreseeable, and probable class of individuals whom Defendants should have been aware could be injured by Defendants' inadequate security protocols. Defendants actively solicited clients who entrusted Defendants with Plaintiff's and the other Class members' PII when obtaining and using Defendants' services. To facilitate these services, Defendants used, handled, gathered, and stored the PII of Plaintiff and the other

Class members. Attendant to Defendants' solicitation, use, and storage, Defendants knew of their inadequate and unreasonable security practices with regard to their computer/server systems and also knew that hackers and thieves routinely attempt to access, steal, and misuse the PII that Defendants actively solicited from clients who entrusted Defendants with Plaintiff's and the other Class members' data. As such, Defendants knew a breach of their systems would cause damage to their clients and Plaintiff and the other Class members. Thus, Defendants had a duty to act reasonably in protecting the PII of their healthcare clients' patients.

148.    The duty included obligations to take reasonable steps to prevent disclosure of the Private Information, and to safeguard the information from theft. Defendants' duties included the responsibility to design, implement, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

149.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, policies, and procedures, and the personnel responsible for them, adequately protected the Private Information.

150.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their patients, which is recognized by laws and regulations including but not limited to the FTC Act, and common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

151.    Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or

affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

152.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information that they either acquire, maintain, or store.

153.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information, as alleged and discussed above.

154.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

155.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

156.    The imposition of a duty of care on Defendants to safeguard the Private Information they maintained is appropriate because any social utility of Defendants' conduct is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

157.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity

theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

158.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

159.    Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

160.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## BREAK OF CONFIDENCE
### (*On Behalf of Plaintiff & All Class Members*)

161.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

162.    At all times during their possession and control of Plaintiff's and Class Members' Private Information, Defendants were fully aware of the confidential, novel, and sensitive nature of Plaintiff's and Class Members' Private Information provided to it.

163.    As alleged herein and above, Defendants' possession and control of Plaintiff's and Class Members' highly sensitive Private Information was governed by the expectations of Plaintiff and Class Members that their Private Information would be collected, stored, and protected in confidence, and that it would not be disclosed to unauthorized third parties.

164.    Plaintiff and Class Members provided their respective Private Information with the understanding that it would be protected and not disseminated to any unauthorized parties.

165.    Plaintiff and Class Members also provided their respective Private Information with the understanding that precautions would be taken to protect it from unauthorized disclosure, and that these precautions would at least include basic principles of information security practices.

166.    Defendants voluntarily received, in confidence, Plaintiff's and Class Members' Private Information with the understanding that the Private Information would not be disclosed or disseminated to the public or any unauthorized third parties.

167.    Due to Defendants' failure to prevent, detect, and/or avoid the Data Breach from occurring by, inter alia, failing to follow best information security practices to secure Plaintiff's and Class Members' Private Information, Plaintiff's and Class Members' Private Information was disclosed and misappropriated to unauthorized criminal third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

168.    But for Defendants' unauthorized disclosure of Plaintiff's and Class Members' Private Information, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third-party criminals. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' Private Information, as well as the resulting damages.

169.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiff's and Class Members' Private Information. Defendants knew or should have known that their security systems were insufficient to protect the Private Information that is coveted and misused by thieves worldwide. Defendants also failed to observe industry standard information security practices.

170.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered damages as alleged herein.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (*On Behalf of Plaintiff & All Class Members*)

171.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

172.    In providing their Private Information to Defendants, Plaintiff and Class Members justifiably placed a special confidence in Defendants to act in good faith and with due regard for the interests of Plaintiff and Class Members to safeguard and keep confidential that Private Information.

173.    Defendants accepted the special confidence Plaintiff and Class Members placed in them, as evidenced by their assertion that they are committed to protecting the privacy of Plaintiff's personal information as included in the Data Breach notification letter.

174.    In light of the special relationship between Defendants, Plaintiff, and Class Members, whereby Defendants became a guardian of Plaintiff's and Class Members' Private Information, Defendants became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for the benefit of their customers, including Plaintiff and Class Members for the safeguarding of Plaintiff's and Class Members' Private Information.

175.     Defendants had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their customer relationships, in particular, to keep secure the Private Information of their customers.

176.     Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

177.     Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

178.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a. Actual identity theft;

b. The compromise, publication, and/or theft of their Private Information;

c. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;

d. Lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

e. The continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession;

f. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

g. The diminished value of the services they paid for and received.

179.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members will suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT IV
## UNJUST ENRICHMENT
### (*On Behalf of Plaintiff & All Class Members*)

180.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

181.    Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they provided Defendants with their Private Information.

182.    In exchange, Plaintiff and Class Members should have received from Defendants data storage that was compliant with and maintained in accordance with Defendants' pre-existing duties to secure such information under federal law and industry standards, and were entitled to have Defendants protect their Private Information with adequate security.

183.    Defendants knew that Plaintiff and Class Members conferred a benefit on them and accepted or retained that benefit. Defendants profited from Plaintiff's and Class Members' Private Information for business purposes.

184.    Defendants failed to secure Plaintiff's and Class Members' Private Information and therefore, did not provide full compensation for the benefit of Plaintiff's and Class Members' Private Information provided.

185.    Defendants acquired the Private Information through inequitable means as they failed to disclose the inadequate security practices previously alleged.

186.    If Plaintiff and Class Members had known that Defendants would not secure their Private Information using adequate security, they would not have provided their information to Defendants' customers.

187.    Plaintiff and Class Members have no adequate remedy at law.

188.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred on them.

189.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and the Class Members overpaid for the use of Defendants' services.

**COUNT V**
**BAILMENT**
**(*On Behalf of Plaintiff & All Class Members*)**

190.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

191.    Defendants acquired and were obligated to safeguard the Private Information of Plaintiff and Class Members.

192.    Defendants accepted possession and took control of Plaintiff's and Class Members' Private Information under such circumstances that the law imposes an obligation to safeguard the property of another.

193.    Specifically, a constructive bailment arises when Defendants, as is the case here, take lawful possession of the property of another and have a duty to account for that property, without intending to appropriate it.

194.    Constructive bailments do not require an express assumption of duties, and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously, or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner.

195.    During the bailment, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care, diligence and prudence in protecting their Private Information.

196.    Defendants breached their duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class Members' Private Information, resulting in the unlawful and unauthorized access to and misuse of such Information.

197.    Defendants further breached their duty to safeguard Plaintiff's and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their Private Information had been breached and compromised.

198.    As a direct and proximate result of Defendants' breach of duty, Plaintiff and Class Members have suffered compensable damages that were reasonably foreseeable to Defendants, including but not limited to, the damages set forth herein.

**COUNT VI**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**N.Y. Gen. Bus. Law § 349, *et seq.***
**(*On Behalf of Plaintiff & All Class Members*)**

199.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

200.    New York Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

201.    By reason of the conduct alleged herein, Defendants engaged in unlawful practices within the meaning of the N.Y. Gen. Bus. Law § 349. The conduct alleged herein is a "business practice" within the meaning of the N.Y. Gen. Bus. Law § 349, and the deception occurred within New York State.

202.    Defendants stored Plaintiff's and Class Members' Private Information in Defendants' electronic databases. Defendants knew or should have known they did not employ reasonable, industry standard, and appropriate security measures that complied with all relevant regulations and would have kept Plaintiff's and Class Members' Private Information secure and prevented the loss or misuse of that Private Information. Defendants did not disclose to Plaintiff and Class Members that their data systems were not secure.

203.    Plaintiff and Class Members would not have provided their Private Information if they had been told or knew that Defendants failed to maintain sufficient security thereof, and their inability to safely store Plaintiff's and Class Members' Private Information.

204.    As alleged herein in this Complaint, Defendants engaged in the unfair or deceptive acts or practices in the conduct of consumer transactions in violation of N.Y. Gen. Bus. Law § 349, including but not limited to:

•    Representing that their services were of a particular standard or quality that they knew or should have known were of another;

• Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

• Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

• Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

• Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Class Members' Private Information, including by implementing and maintaining reasonable security measures;

• Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

• Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Personal Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach.

205.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

206.    Such acts by Defendants are and were deceptive acts or practices which are and/or were likely to mislead a reasonable consumer providing his or her Private Information to

Defendants. Said deceptive acts and practices are material. The requests for and use of such Private Information in New York through deceptive means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer fraud statute, N.Y. Gen. Bus. Law § 349.

207.    In addition, Defendants' failure to secure patients' Private Information violated the FTCA and therefore violates N.Y. Gen. Bus. Law § 349.

208.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard the Private Information of Plaintiff and Class Members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely. Plaintiff and Class Members accordingly seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

209.    The aforesaid conduct violated N.Y. Gen. Bus. Law § 349, in that it is a restraint on trade or commerce.

210.    Defendants' violations of N.Y. Gen. Bus. Law § 349 have an impact and general importance to the public, including the people of New York. Thousands of New Yorkers have had their Private Information stored on Defendants' electronic database, many of whom have been impacted by the Data Breach.

211.    As a direct and proximate result of these deceptive trade practices, Plaintiff and Class Members are entitled to judgment under N.Y. Gen. Bus. Law § 349, to enjoin further violations, to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

212.    On information and belief, Defendants formulated and conceived of the systems used to compile and maintain patient information largely within the state of New York, oversaw their data privacy program complained of herein from New York, and their communications and other efforts to hold participant data largely emanated from New York.

213.    Most, if not all, of the alleged misrepresentations and omissions by Defendants that led to inadequate measures to protect patient information occurred within or were approved within New York.

214.    Defendants' implied and express representations that they would adequately safeguard Plaintiff's and Class Members' Private Information constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of N.Y. Gen. Bus. Law § 349.

215.    Accordingly, Plaintiff, on behalf of himself and Class Members, bring this action under N.Y. Gen. Bus. Law § 349 to seek such injunctive relief necessary to enjoin further violations and recover costs of this action, including reasonable attorneys' fees and other costs.

### COUNT VII
### CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)
### Conn. Gen. Stat. §§ 42-110a, *et seq*.
### *(On Behalf of Plaintiff & the Connecticut Subclass)*

216.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

217.    Defendants are each a "person" as defined by Conn. Gen. Stat. § 42-110a(3).

218.    Defendants engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Conn. Gen. Stat. § 42-110b(a).

219.    Defendants' representations and omissions include both implicit and explicit representations.

220.    Defendants' unfair and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and the Connecticut Subclass's PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the Connecticut Subclass's PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Connecticut security breach law, Conn. Gen. Stat. § 36a-701b;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and the Connecticut Subclass's PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the Connecticut Subclass's PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Connecticut security breach law, Conn. Gen. Stat. § 36a-701b;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and the Connecticut Subclass's PII; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and the Connecticut Subclass's PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and Connecticut security breach law, Conn. Gen. Stat. § 36a-701b.

221.    Defendants' acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

222.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and the Connecticut Subclass, that their PII was not exposed and misled Plaintiff and the Connecticut Subclass into believing they did not need to take actions to secure their identities.

223.    The injury to consumers from Defendants' conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their PII or the security of their identity or credit.

224.    The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of injury which consumers could not have reasonably avoided because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of their data security programs, Defendants created an asymmetry of information between themselves and consumers that precluded consumers from taking action to avoid or mitigate injury.

225.    Defendants' inadequate data security had no countervailing benefit to consumers or to competition.

226.    Defendants also engaged in "deceptive" acts and practices in violation of Conn. Gen. Stat. § 42-110b(a), including:

a. Misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have;

b. Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

c. Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects.

227.    Defendants intended to mislead Plaintiff and the Connecticut Subclass and induce them to rely on their misrepresentations and omissions.

228.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

229.    Had Defendants disclosed to Plaintiff and the Connecticut Subclass that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiff and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls, and the security controls of their agents and representatives, secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for

PII data, Plaintiff and the Connecticut Subclass acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

230.    Defendants had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extent of the PII in their possession. This duty arose because Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiff and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls, and the security controls of their agents and representatives, a secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiff, the Class, and the Connecticut Subclass acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff and the Connecticut Subclass—and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants.

231.    Consumers could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of their data security programs, Defendants created an asymmetry of information between them and consumers that precluded consumers from taking action to avoid or mitigate injury.

232.    Defendants' inadequate data security had no countervailing benefit to consumers or to competition.

233.    Defendants also engaged in "deceptive" acts and practices in violation of Conn. Gen. Stat. § 42-110b(a), including:

a. Misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have;

b. Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

c. Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects.

234.    Defendants intended to mislead Plaintiff and the Connecticut Subclass and induce them to rely on their misrepresentations and omissions.

235.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

236.    Had Defendants disclosed to Plaintiff and the Connecticut Subclass that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiff and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls, and the security controls of their agents and representatives, secret from the

public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiff and the Connecticut Subclass acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

237.    Defendants had a duty to disclose the above-described facts due to the circumstances of this case and the sensitivity and extent of the PII in their possession. This duty arose because Defendants were trusted with sensitive and valuable PII regarding tens of thousands of consumers, including Plaintiff and the Connecticut Subclass. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls, and the security controls of their agents and representatives, a secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for PII data, Plaintiff and the Connecticut Subclass acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered. In addition, such a duty is implied by law due to the nature of the relationship between consumers— including Plaintiff and the Connecticut Subclass—and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants.

238.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff and the Connecticut Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

239.    Defendants' violations present a continuing risk to Plaintiff and the Connecticut Subclass as well as to the general public.

240.    Plaintiff and the Connecticut Subclass seek all monetary and non-monetary relief allowed by law under Conn. Gen. Stat. § 42-110g(a), including actual damages; punitive damages; injunctive relief; restitution; reasonable attorneys' fees and costs; and any other relief that the Court deems appropriate.

**COUNT VIII**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff & All Class Members)*

241.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

242.    Plaintiff and Class Members were required to provide their Private Information to Defendants as a condition of their use of Defendants' services.

243.    Plaintiff and Class Members paid money to Defendants in exchange for services, along with Defendants' promise to protect their Private Information from unauthorized access and disclosure.

244.    Implicit in the agreement between Plaintiff and Class Members and the Defendants to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

245. When Plaintiff and Class Members provided their PII and PHI to Defendants, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

246. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

247. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure, including monitoring their computer systems and networks to ensure that they adopted reasonable data security measures.

248. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

249. Defendants breached their implied contracts with Class Members by failing to safeguard and protect their Private Information.

250. As a direct and proximate result of Defendants' breaches of the implied contracts, Class Members sustained damages as alleged herein.

251. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

252. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide and continue to provide adequate credit monitoring to all Class Members.

## COUNT IX
## DECLARATORY AND INJUNCTIVE RELIEF
### (*On Behalf of Plaintiff & All Class Members*)

253.    Plaintiff and the Class repeat and re-allege all other paragraphs of the Complaint as if fully set forth herein.

254.    Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

255.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.,* this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

256.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' Private Information, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their Private Information will occur in the future.

257.    The Court should also issue prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect employee and patient Private Information.

258.    Defendants still possess the Private Information of Plaintiff and the Class.

259.    To Plaintiff's knowledge, Defendants have made no announcement that they have changed their data storage or security practices relating to the Private Information, beyond the

vague claim in the Data Breach Letter that they are "[taking] steps to enhance the security of our computer systems and the data we maintain."

260.    To Plaintiff's knowledge, Defendants have made no announcement or notification that they have remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

261.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Enzo. The risk of another such breach is real, immediate, and substantial.

262.    As described above, actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that led to such exposure.

263.    There is no reason to believe that Defendants' employee training and security measures are any more adequate now than they were before the breach to meet Defendants' contractual obligations and legal duties.

264.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs at Enzo, Plaintiff and Class Members will likely continue to be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

265.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Enzo, thus eliminating the additional injuries that would result to Plaintiff and Class.

266.     Plaintiff and Class Members, therefore, seek a declaration (1) that Defendants' existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security, and (2) that to comply with contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Ordering that Defendants engage internal security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendants audit, test, and train their security personnel and employees regarding any new or modified data security policies and procedures;

d. Ordering that Defendants purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for their provision of services;

e. Ordering that Defendants conduct regular database scanning and security checks; and

f. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, client personally identifiable information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, respectfully requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Class, and appointing Plaintiff as class representative and his Counsel as lead counsel for the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII and PHI of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

   iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

65

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v. prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Dated: July 5, 2023

**LAW OFFICE OF PAUL C. WHALEN, P.C.**


By:  _/s/Paul C. Whalen_ _____
Paul C. Whalen (PW-1300)
768 Plandome Road
Manhasset, New York, 11030
Direct Tel: +1 (516) 426-6870
Google Fi: +1(631) 612-3905
pcwhalen@proton.me

# Exhibit 1



May 31, 2023



79 1 36644 ******************AUTO**5-DIGIT 05797
JAMES MURRAY

Dear James Murray,

At Enzo Clinical Labs we are committed to protecting the privacy and security of your information. We perform clinical laboratory and diagnostic services, and we are writing to inform you of an incident that involved some of your information. This letter explains the incident, measures we have taken, and some steps you may consider taking in response.

**What Happened?** On April 6, 2023, we identified a ransomware incident on our computer network. We immediately took steps to secure our systems and began an investigation with the assistance of a cybersecurity firm. We also notified law enforcement. The investigation determined that an unauthorized party accessed files on our systems between April 4, 2023, and April 6, 2023.

**What Information Was Involved?** The files contained your name, date of service, and clinical test information. Your Social Security number, billing, and payment information were **not** included.

**What We Are Doing and What You Can Do.** We want you to know that we take this incident very seriously. To help prevent something like this from happening in the future, we have and will continue to take steps to enhance the security of our computer systems and the data we maintain. We also recommend that you review statements you receive from your healthcare providers for accuracy and contact your providers with any questions.

**For More Information.** If you have any questions about this incident, please call (866) 547-1115, Monday through Friday, 9:00 a.m.–6:30 p.m. Eastern Time, excluding some major U.S. holidays.

Sincerely,

*Enzo Clinical Labs*